**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,** | ) ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. DKC 09 CV2570** |
| | **)** | |
| **v.** | ) | |
| | ) | |
| **CTI GLOBAL SOLUTIONS INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |
| _____ | ) | |

**EEOC'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT**

**I.   INTRODUCTION**

The undisputed material facts show that Defendant CTI Global Solutions Inc., a staffing agency, violated Sections 701(k) and 703(a) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§2000e(k) and 2000e-2(a) by firing Charging Party Rita Tolliver and classmembers Anje Proctor and Alfre Tisdale[1] because they were pregnant.  The record evidence shows that pregnancy was the sole reason for their termination and that Tolliver, Proctor, and Tisdale took more than adequate steps to mitigate their damages.  Therefore, the Equal Employment Opportunity Commission ("EEOC" or "the Commission") moves this Court to enter judgment in its favor on the issues of liability and mitigation of damages and set this matter for trial by jury on all remaining issues.

---

[1] At the time she was employed by CTI, classmember Alfre Tisdale was known as Alfre Tisdale-Ortiz.

## II.  PLAINTIFF'S STATEMENT OF FACTS

### A.    CTI Global Solutions Inc. and the ARC Project

Defendant CTI Global Solutions Inc., ("CTI" or "Defendant") "is a full-service business support firm headquartered in Largo, Maryland, [that] specializes in the planning and implementation of alternative methodologies for supporting the business needs of the public and private sectors." *See* Defendant's website, available at http://www.cti-gs.com.  Defendant is a government contractor and recruiting company that has supplied staff for government projects since its inception in 1989.  (Plaintiff's Exhibit ("PX") 1, Deposition of Rodney Whitfield,[2] hereinafter, "PX1 Whitfield" at p. 26, l. 2-13).  The company employed 150 people annually in 2007, 2008 and 2009.  (*Id.* p. 26, l. 19 to p. 27, l. 6).

In September of 2008, CTI began staffing a project at the FBI's Alexandria Records Center (ARC).  (PX2 Deposition of Patricia W. Carroll Ph.D., hereinafter, "PX2 Caroll" at p. 45, l. 9-14).  CTI contracted with the FBI to provide staff to prepare 20 million documents for shipment to Southwest Virginia.  (PX2 Caroll p. 45, l. 18 to p. 46, l. 1 & PX1 Whitfield p. 32, l. 18 to p. 33, l. 5).  The staff that CTI supplied were employees of CTI and not the FBI.  (PX2 Caroll  p. 45, l. 18 to p. 46, l. 1).

Defendant posted an advertisement for positions on the ARC project.  (PX3 Deposition of Keith Moore, hereinafter, "PX3 Moore" at p. 101, l. 8 to p. 103, l. 5).  The advertisement stated that the job required the ability to lift 20 pounds.  (*Id. &* Exhibit 17 to PX3 Deposition of Keith Moore, hereinafter "PX3 Moore Ex. 17").   The advertisement for the position did not mention ladder climbing.  (*Id.* p. 101, l. 8 to p. 103, l. 5 & Moore Ex. 18).  Defendant also created a job description which set forth the physical requirements of lifting 25 pounds and, unlike the job

---

[2] Rodney Whitfield was Chief Financial Officer for CTI.  (Exhibit 2 to PX2 Deposition of Rodney Whitfield, hereinafter, "PX2 Whitfield Ex. 2").

advertisement, the ability to climb a ladder.  (PX3 Moore p. 105, l. 2 to p. 106, l. 8 & Moore Ex.

18).  CTI's job application form for the project did not solicit information regarding lifting and

ladder climbing, (*Id.* p. 57, l. 20 to p. 58, l. 9; p. 83, l. 4-8; p. 96, l. 14 to p. 97, l. 10), and

Defendant did not test applicants to verify their ability to lift and climb (*Id.* at p. 59, l. 1-14; p. 69,

l. 20 to p. 70, l. 5 & PX1 Whitfield p. 39, l. 11 to p. 40, l. 1; 81, l. 5-8).  Instead, Defendant

accepted candidates' representations that they could perform the necessary physical tasks.  (PX3

Moore p. 59, l. 15 to p. 60, l. 17).

### B.    Charging Party Rita Tolliver

In October of 2008 CTI hired Charging Party Rita Tolliver to work on the ARC project.

(PX4 Declaration[3] of Rita Tolliver, hereinafter, "Tolliver Dec." at ¶2).  Orientation for the

position began on October 14, 2008.  (*Id.* ¶3).  Tolliver was visibly pregnant at that time.  (*Id.* ¶4).

During orientation, Defendant's Chief Financial Officer Rodney Whitfield noticed that Tolliver

appeared to be pregnant. (PX1 Whitfield p. 47, l. 6, to p. 48, l. 9).  Tolliver had not met

previously with Whitfield at any point in the hiring process. (PX4 Tolliver Dec. ¶6).  Whitfield

approached Tolliver and asked her to step outside of the orientation session. (PX1 Whitfield p.

47, l. 6, to p. 48, l. 9).  Whitfield then terminated Tolliver from the ARC Project because she was

pregnant.  (*Id.* p. 63, l. 1-14).  He told Tolliver that the termination was necessary because her

pregnancy would prevent her from lifting and climbing a ladder.  (PX4 Tolliver Dec. ¶8).  Had

Tolliver not been pregnant, Defendant would not have terminated her employment.  (PX3 Moore

p. 99, l. 7-12).

Tolliver made it known to Whitfield that she was capable of performing the required

work. (PX1 Whitfield p. 73, l. 14-19).  Defendant did not order a medical examination to

ascertain Tolliver's fitness for duty.  (PX1 Whitfield p. 62, l. 18-21).  At no point did Tolliver

---

[3] Defendant did not depose any of the classmembers in this matter.

indicate that she was unable or unwilling to climb a ladder or lift objects weighing up to 25 pounds.  (PX3 Moore p. 98, l. 4-9).  This was Tolliver's fourth pregnancy and she was accustomed to performing strenuous work while pregnant. (PX4 Tolliver Dec. ¶10).  Whitfield, nevertheless, did not credit Tolliver's representation that she could perform the necessary physical tasks, (PX1 Whitfield p. 73, l. 20 to p. 74, l. 5),  Whitfield did not accept Tolliver's assessment because he believed that, due to her pregnancy, she was the "same as a boxer who gets knocked out who -- who all of a sudden says I'm fine to the referee and the referee says, no, I don't think you can[4]"  (*Id.* p. 74, l. 6-14).

FBI personnel were onsite at the time Tolliver was terminated.  (PX5 Declaration of Marilyn Moore,[5] hereinafter, "M. Moore Dec." at ¶10).  The FBI personnel onsite at the time Tolliver was removed noticed that she appeared to be pregnant; yet had not asked CTI to remove her.[6]  (PX5 M. Moore Dec. at ¶¶9-12 & PX6 Declaration of Leslie Payne,[7] hereinafter, "Payne Dec." at ¶¶8-11).   The FBI had no policy restricting the role of pregnant women on the project. (PX5 M. Moore Dec. at ¶¶5-7).

---

[4] Rodney Whitfield has no medical background. (PX1 Whitfield p. 49, l.13-20).

[5] Between May of 2008 and May of 2010 Marilyn Moore worked as the Records Policy and Administration Management Section Chief for the FBI.  (M. Moore Dec. ¶2).  She supervised two units of FBI employees who worked with the temporary contract workers that CTI supplied to the Alexandria Records Center. (*Id.* ¶3).  She met with CTI officials on a weekly basis regarding the ongoing project at the Alexandria Records Center, and on the first day of orientation, she verified the arrival of the temporary workers CTI supplied and escorted some of the contractors to the orientation classroom.  (*Id.* ¶4).

[6] Two of Defendant's Officers maintain that the FBI ordered that the Charging Party and classmembers be fired. (PX2 Carroll p. 74, 1 .16 to p. 75, l. 2 & PX3 Moore p. 65, l. 10-14 ).  As is argued in §III(D)(2) of Argument below, this factual dispute does not create a *material* issue of fact.

[7] Leslie Payne was the chief liaison between CTI and the government during the time that CTI staffed the Alexandria Records Center project.  (PX6 Declaration of Leslie Payne, hereinafter, "Payne Dec." at ¶2).  She met with CTI officials on a weekly basis regarding the project and she has knowledge of the FBI's expectations of CTI, the physical requirements for workers on the project and the staffing requirements for the project.  (*Id.* at ¶3).

### C.    Classmembers Alfre Tisdale and Anje Proctor

1.    Tisdale and Proctor are Hired to Work on the ARC Project

Classmembers Alfre Tisdale and Anje Proctor applied for work with Defendant on November 20, 2008 and January 22, 2009 respectively. (PX3 Moore p. 82, l. 14 to p. 83, l. 3; 56, l. 8-15). Proctor and Tisdale were not pregnant at the time they applied or at the time they were hired. (PX7 Declaration of Alfre Tisdale, hereinafter, "PX7 Tisdale Dec." at ¶3 & PX8 Declaration of Anje Proctor, hereinafter, "PX8 Proctor Dec." at ¶3). Upon hire, Proctor and Tisdale were paid $16.00 an hour plus benefits including participation in a 401k plan, life insurance, health insurance and two weeks of vacation time after one year of service. (PX3 Moore p. 61, l. 15-17; 83, l. 18-20 & PX7 Tisdale Dec. ¶4).

2.    Tisdale and Proctor's Job Duties

Proctor and Tisdale worked in FBI Building 841 filing mail. (PX9 Deposition of Elaine Wright,[8] hereinafter, "PX9 Wright" at p. 65, l. 1-15; 71, l. 14 to p. 72, l. 9). Their work consisted of placing mail in and retrieving mail from expandable files. (PX9 Wright p. 57, l. 5-16). Building 841 was unique in that the employees stationed there were not required to "box up" files. (PX9 Wright p. 59, l. 20 to p. 60, l. 4). Employees only used ladders when they needed to put mail in files on higher shelves. (PX9 Wright p. 57, l. 17 to p. 58, l. 4). The ladders had steps and rails. (PX10 Deposition of Bernard Fisher,[9] hereinafter, "PX10 Fisher" at p. 40, l. 7-19). Climbing one was comparable to climbing a stair case. *Id.* In the event something heavy needed to go up a ladder, employees were free to ask other employees for

---

[8] Elaine Wright was a program manager for Defendant at the ARC project. Her primary duty was supervising employees. (PX9 Deposition of Elaine Wright, hereinafter, "Wright" at p. 37, l. 11-17).

[9] Bernard Fisher was program manager for the ARC. He supervised all of Defendant's employees at the ARC including Tisdale and Proctor. (PX10 Deposition of Bernard Fisher, hereinafter, "Fisher" at p. 45, l. 2-18). He also supervised Elaine Wright notwithstanding the fact that they had the same job title. (PX9 Wright p. 46, l. 18 to p. 47, l. 16).

assistance.  (PX10 Fisher p. 40, l. 20 to p. 41, l.18).  Proctor rarely climbed a ladder and engaged in no strenuous lifting.  (PX8 Proctor Dec. at ¶5).  Tisdale rarely climbed the ladder and engaged in little strenuous lifting.  (PX7 Tisdale Dec. ¶5).

    3.    <u>Proctor's and Tisdale's Pregnancies, Job Performance and Termination</u>

Proctor and Tisdale became pregnant in the spring of 2009.  (PX7 Tisdale Dec. ¶7 & PX8 Proctor Dec. ¶6).  In June of 2009, Tisdale asked permission to lift no more than 15 pounds and to be excused from climbing the ladder.  (Tisdale Dec ¶¶8-10).  CTI has excused other ARC employees from lifting and ladder climbing when it was ordered by their health care providers. (PX9 Wright Ex. 2 at Interrogatory Answer 6 p. 11-12).  Tisdale's request was granted for a period of time, (PX10 Fisher p. 50, l. 6-17 & PX7 Tisdale Dec. ¶10),  during which, work continued at the same pace, Tisdale was productive the entire day, and no one was hired or reassigned to lift or climb ladders for her.  (PX7 Tisdale Dec. ¶11).

Defendant's ARC Program Manager Bernard Fisher reported Tisdale's pregnancy to Defendant's Operations Manager Keith Moore.[10]  (PX3 Moore p. 83, l. 21 to p. 84, l. 11). Fisher also informed Moore of Proctor's pregnancy out of concern for her safety.  (PX10 Fisher p. 43, l. 16 to p. 44, l. 6).  On July 8, 2009, Defendant fired Proctor and Tisdale because they were pregnant.  (PX10 Fisher p. 42, l. 7-16; 46, l. 4-8 & PX9 Wright  p. 70, l. 6-9 & PX3 Moore p. 63, l. 20 to p. 65, l. 14; p.  86, l. 7-9; p. 87, 1. 13-19 & PX3 Moore Ex. 18).

It would have been possible to continue meeting Tisdale's request to be excused from ladder climbing and lifting.  (PX10 Fisher p. 49, l. 1-8).  Continuing to honor Tisdale's request would not have been disruptive to operations or unfair to other employees.  (*Id.* p. 49, l. to p. 50, l. 5).  Tisdale's supervisor had no criticisms of her performance.  (*Id.* p. 45, l. 14 to p. 46, l. 3).

---

[10] Keith Moore was operations manager at the time of Proctor's and Tisdale's dismissal (*Id.* p. 24, l. 17 to p. 25, l. 24).  As operations manager he was one of the company's executives (*Id.* p. 28 l. 10-12) and was responsible for implementing the company's anti-discrimination policy (PX1 Whitfield p. 23, l. 10 to p. 25, l. 5).

Proctor was fully able to perform her job duties while pregnant. (PX8 Proctor Dec. ¶7). Proctor's supervisor had no criticisms of her performance (PX9 Wright p. 69, l.11-13), and her performance remained acceptable through her last day of employment with the company. (PX10 Fisher p. 43, l. 7-12).

Defendant's President, Patricia W. Carroll, informed Defendant's contact at the FBI, Leslie Payne, that Proctor and Tisdale were removed from the project because CTI had set a precedent by removing Tolliver. (PX6 Payne Dec. at ¶¶12-13). Defendant also told Tisdale that she was being removed "for fairness." (PX7 Tisdale Dec at ¶12). At the time of termination, the FBI would have supported moving Proctor and Tisdale to the "disposition team" which primarily worked doing filing from a seated position. (PX6 Payne Dec. at ¶¶14-15). The FBI also would have supported an arrangement in which another employee would perform lifting and ladder climbing tasks for a pregnant employee. (*Id.* ¶16).

**D.    Mitigation by Charging Party and Classmembers**

1.    Tolliver's Job Search

Defendant had no alternative positions available for Rita Tolliver at the time she was terminated. (PX1 Whitfield p. 66, l. 6-21). Tolliver demanded to meet with CTI to discuss other options for employment. (*Id.* p. 65, l. 16 to p. 66, l. 5). Defendant agreed to meet but intended to have an attorney present at the meeting. (PX1 Whitfield p. 77, l. 7 to p. 78, l. 8). Tolliver did not have legal representation and asked CTI for email confirmation of the time and date of the meeting as well as a list of those who would be present. (PX4 Tolliver Dec. ¶14). CTI refused to provide email confirmation, and Tolliver chose not to attend the meeting because she felt she was not being taken seriously. (*Id.* ¶15). Defendant admits that it did not intend to offer Tolliver a position at the meeting. (PX1 Whitfield p. 66, l. 6 to p. 67, l. 19).

Shortly after her dismissal from CTI, Tolliver, who is fluent in Swahili, found work as an interpreter for lawyers defending a terrorism suspect. (PX4 Tolliver Dec. ¶16). The translation work was sporadic, and therefore paid less than the job with CTI and did not provide benefits. (*Id.* ¶17). The work forced her to be away from her children, but at the time her family could not afford for her to be without paid work. (*Id.*).

In October of 2008, Tolliver received medical clearance to fly to Guantanamo Bay to provide translation services. (*Id.* ¶18). She served as an interpreter at Guantanamo Bay during her eighth month of pregnancy. (*Id.* ¶19). On November 29, 2008, Tolliver gave birth to a healthy baby. (*Id.* 20). Four days after giving birth, Tolliver was able to drive herself to the doctor's office. Two weeks later she returned to work translating at Guantanamo Bay. (*Id.* ¶21).

While Tolliver preferred to work at a job in close proximity to her infant, she was unable to find such work. (*Id.* ¶22). Tolliver has constantly pursued opportunities for full time employment outside of providing translation services. She has networked heavily, posted resumes online, applied for numerous positions and attended job fairs. (*Id.* at ¶23). To date, she has been unable to find work.[11] (*Id.* at ¶24).

2.     Tisdale's Job Search

Defendant did not have another job available for Tisdale when it terminated her from the ARC project in July 2009. (PX3 Moore p. 90, l. 15-21 & PX2 Caroll p. 64, l. 6-20). Tisdale was offered some work after termination but no full time work was available until October 5, 2009. (PX7 Tisdale Dec. 13-16). By September of 2009 Tisdale had received only two temporary one-day assignments. (*Id.* at 14). On October 5, 2009, Tisdale began a full time assignment at the Pentagon. (*Id.* 16). The Pentagon job paid less than the ARC project but Tisdale accepted the

---

[11] Defendant's contract with the FBI terminated effective September 30, 2010. The Commission does not seek back pay for Tolliver or the remaining classmembers past this date.

position because she was unable to find other work. (*Id.* at 17). Due to fatigue, Tisdale left the Pentagon job on December 17, 2009. (*Id.* at 18).

Her job search resumed after she gave birth. Tisdale has applied for over 100 positions since being terminated from the FBI file room. (*Id.* 20 & Exhibit A to PX7 Tolliver Dec. (Exhibit A is a screen print of the sent items folder from Tisdale's email account. Emails sending out resumes and job applications are highlighted in pink)). She has also attempted to find work by networking and posting a resume on job search websites. (*Id.* 21). To improve her chances of finding employment Tolliver enrolled in information technology courses through the University of Phoenix. (*Id.* 22). The course work at the University of Phoenix was done in addition to, and not instead of, an active job search. (*Id.*). Tisdale did not find full-time employment prior to the termination of the ARC project.

3.    Proctor's Job Search

Defendant did not have another job available for Proctor when she was terminated from the ARC project in July 2009. (PX3 Moore 90, l. 15-21 & PX2 Caroll 64, l. 6-20). On a few occasions Defendant had one day assignments available for Proctor, but these positions paid less than the ARC project. (PX8 Proctor Dec. 10). Proctor accepted these positions because she needed an income and no better paying job was available. (*Id.* 11). She searched for other work by posting resumes on CareerBuilder.com and Monster.com. (*Id.* 12). In October of 2009, she found work with another staffing agency that paid more than the ARC project. (*Id.* 13). The Commission does not seek back pay for Proctor beyond this date.

## III. <u>ARGUMENT</u>

### A.    Summary Judgment Standard

Summary judgment is appropriate when there is no dispute as to a material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Adickes v. S.H. Kress & Co*., 398 U.S. 144, 157 (1970). Summary judgment is appropriate if a rational trier of fact could not find for the non-moving party in light of the record as a whole. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248-49 (1986).  The discussion below and the evidence in support thereof, support an award of partial summary judgment finding that Defendant violated the Title VII of the Civil Rights Act of 1964, as amended, by terminating Tolliver, Proctor and Tisdale and that these individuals fulfilled their duty of making reasonable attempts to mitigate their damages.

### B.    Discrimination Based On Pregnancy Constitutes Discrimination Based On Sex.

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to discriminate against an individual with respect to ... compensation, terms, conditions, or privileges of employment because of such individual's ...sex." 42 U.S.C. §2000e-2(a)(1). Section 701(k) of Title VII, entitled the Pregnancy Discrimination Act of 1978, makes clear that

> [t]he terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes ....

42 U.S.C. §2000e-(k). The Commission's claim of pregnancy discrimination thereby is encompassed by Title VII's prohibition against sex discrimination and clearly is actionable.

### C.    Direct Evidence Establishes that Defendant Violated Title VII

In this matter there is direct evidence of pregnancy discrimination. Direct evidence is "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Taylor v. Virginia Union Univ.*, 193 F.3d 219, 232 (4th Cir.1999)(en banc). Here the direct evidence is in the form of admissions under oath that pregnancy was the basis for the termination. (PX1 Whitfield p. 63, l. 1-14 & PX10 Fisher p. 42, l. 7-16; p. 46, l. 4-8 & PX9 Wright p. 70, l. 6-9 & PX4 Moore p. 87, l. 13-19 (Pregnant women must be removed from contract.)). Defendant has admitted that if Proctor had not been pregnant she could have worked through the duration of the contract. (PX3 Moore 78, l. 3-15; 99, l. 13-17). Defendant concedes that Tisdale's supervisor had no criticism of her performance. (PX10 Fisher 45, l. 14 to p. 46, l. 3). Defendant also concedes that Tolliver would have been able to keep her position if not pregnant. (PX3 Moore 99, l. 7-12).

As the Supreme Court recognized, under the Pregnancy Discrimination Act (PDA), which amended Title VII, *see* 42 U.S.C. § 2000e(k), "employers will no longer be able to force women who become pregnant to stop working regardless of their ability to continue." *Int'l Union United Auto v. Johnson Controls,* 499 U.S. 187, 205 (1991) *quoting* Amending Title VII, Civil Rights Act of 1964, S.Rep. No. 95-331, pp. 4-6 (1977). Defendant did exactly what the statute prohibits. It prevented Tolliver, Tisdale and Proctor from working regardless of their ability to continue.

There is no record evidence to support an argument that the Charging Party and classmembers were not adequately performing at the time of their discharge. Tolliver was not allowed to attempt the job, Proctor was performing well, and Tisdale was working productively on restricted duty. In *EEOC v. Old Dominion Security Corp.,* 85-CV-90-NN, 1986 WL 32649 (E.D.Va. July 16, 1986), the court granted judgment in favor of the Commission when the

Defendant did not offer medical evidence to support its contention that pregnancy interfered with the claimant's ability to work. In that matter, the employer terminated a security guard during her ninth month of pregnancy. *Id.* *1. The court rejected the defendant's contention that pregnancy interfered with the claimant's performance because it was not supported by objective medical evidence. *Id.* at *7. The court found that essentially the defendant had asked it to assume that its assumption of disability was correct. *Id.* As the court put it, "an employer cannot force a pregnant employee off the job based on nothing more than its own arbitrary opinion." *Id.* at *6.

Similar to the defendant in *Old Dominion*, Defendant can offer nothing more than its arbitrary opinion that the Charging Party or classmembers were, or would have been, unable to perform. During EEOC's investigation, for example, Defendant submitted a position statement signed by its CFO Whitfield and CEO Carroll which made numerous unsupported medical claims to justify its actions including an argument that "it is much easier for the cervix to open after giving birth because the cervix becomes much more flexible. The woman can lose the baby and not know why." (PX1 Winfield Ex. 2). (*Id.*). When questioned about the medical claims made in the statement, Whitfield conceded, "I don't have . . . the knowledge . . . that's too medical for me. I haven't watched that many medical shows for me to know that information." (PX1 Whitfield p. 82, l. 11-21). Carroll also has no medical training. (PX2 Caroll p. 10, l. 7 to p. 11, l. 19). Indeed, she admitted she gathered the medical information contained in the position statement (PX1 Whitfield Ex. 2) during a conversation with her former neighbor, a retired doctor. (PX2 Carroll p. 75, l. 3 to p. 77, l. 19 & PX2 Carroll Ex. 3)( PX1 Whitfield Ex. 2  and PX2 Carroll Ex. 3 are the same document.) The medical information contained in the document is therefore inadmissible hearsay. Further, Defendant has not designated these officers as expert

witnesses pursuant to Fed. R. Civ. P. 26(a)(2), or submitted a report for any testifying expert in this matter.

There is simply no basis for the assertion and Tolliver and Proctor could not perform. Nor is there any factual basis to support the contention that Tisdale was not performing. Her supervisor found her work to be acceptable, other employees had been provided with light duty work, and the FBI, Defendant's client, was supportive of light duty work. (PX10 Fisher p. 45, l. 14 to p. 46, l. 3 & PX9 Wright Ex. 2 at Interrogatory Answer 6 p. 11-12 & PX6 Payne Dec. at ¶¶14-15). Partial summary judgment for the Plaintiff on the issue of liability is appropriate here because the evidence is unequivocal that Defendant terminated Tolliver, Proctor, and Tisdale simply because they were pregnant. As argued below, Defendant does not have an available affirmative defense.

**D.    Defendant Cannot Establish a Bona Fide Occupational Qualification Defense to Escape Liability.**

An explicit pregnancy-based employment practice is sex discrimination under 42 U.S.C. §2000e-2(a) and may only be defended as a Bona Fide Occupational Qualification (BFOQ). *Johnson Controls,* 499 U.S. at 199-200. A defendant must assert a BFOQ defense when its conduct "does not pass the simple test of whether the evidence shows 'treatment of a person in a manner which but for that person's sex would be different.'" *Id.* at 200, *quoting Los Angeles Dept. of Water and Power v. Manhart*, 435 U.S. 702 (1978) (internal citations omitted). Defendant has explicitly admitted that Proctor and Tolliver would have remained on the project if they were not pregnant. (PX3 Moore p. 78, l. 3-15; p. 99, l. 7-17). In regard to Tisdale, Defendant concedes that her performance was acceptable (PX10 Fisher p. 45, l. 14 to p. 46, l. 3) and maintains that she was terminated based on a rule or policy against employing pregnant

women at the ARC project.[12]  (PX3 Moore p. 85, l. 10 to p. 86, l. 8).  Defendant therefore must establish that non-pregnancy is a BFOQ for working at the ARC.

The BFOQ exception is an extremely narrow exception to Title VII's prohibition against sex discrimination.  *Dothard v. Rawlinson*, 433 U.S. 321, 334 (1977).  The defendant employer bears the burden of proving the BFOQ defense.  *U.S. v. Gregory,* 818 F.2d 1114, 1118 (4th Cir. 1987).  When the Defendant does not offer proof supporting its BFOQ defense, judgment in its favor is reversible error.  *Id*.  Defendant is therefore required to provide evidence that could enable a rational trier of fact to conclude that non-pregnancy is a BFOQ for working on the ARC project.

1.     The Safety Concerns Alleged by Defendant do not Support a BFOQ Defense.

Although Defendant did not assert a BFOQ Defense as an affirmative defense in its Answer, Defendant does contend that it would be unsafe for pregnant women to work in the FBI file room due to the risk of injury for themselves and for their unborn children.  (PX1 Whitfield 63, l. 1-14).  As Defendant explained in the position statement it submitted during the EEOC's administrative investigation:

> A five month pregnancy is beyond the halfway mark.  The placenta is growing prior to the halfway mark, but after the halfway mark the baby is growing.  The woman can lose her balance and fall backwards when she is beyond the halfway mark especially when she is going up and down a ladder.

> Ms. Tolliver was removed from her job due to her safety and the safety of her unborn child who is considered a person at that point.  When someone is charged with the murder of a pregnant woman who is beyond the half-way mark, they can be charged with the death of two people. (PX1 Whitfield Ex. 2).

---

[12] Defendant maintains that the policy is imposed by the FBI.  (PX3 Moore 85, l. 10-21).  As argued below in §III(D)(4), customer requirements do not transform an otherwise discriminatory practice into a BFOQ.

These concerns do not support a BFOQ defense since "danger to a woman herself does not justify discrimination." *Johnson Controls*, 499 U.S. at 202 *citing Dothard,* 433 U.S. at 335.  In regard to injury to the unborn child, the Supreme Court has found that, "decisions about the welfare of future children must be left to the parents who conceive, bear, support, and raise them rather than to the employers who hire those parents." *Id.* at 206.  In *Johnson Controls* the Supreme Court held that an employer could not, as a matter of law, establish a BFOQ defense based on a risk of employment related fetal injury.  (*Id.*).

This case is analogous to *EEOC v. Ecurie Alford Ltd.*, 91-CV-113-NN, 1993 WL 389433, 62 Fair Empl. Prac.Cas. (BNA) 1018 ( E.D.Va. July 15, 1993).  In that matter the charging party was employed as a horse groomer.  *Id.* at *1.  Citing safety concerns, her employer terminated her when she became pregnant.  *Id.* at *2.  As in this case, the defendant's testimony confirmed that pregnancy was the reason for the discharge.  *Id.* at *6.  Based on these admissions the court found that the Commission proved by a preponderance of the evidence that the charging party was discharged due to pregnancy.  *Id.*  In ruling for the Commission the court found that "[d]ischarge from employment because of pregnancy will ordinarily constitute unlawful sex discrimination." *Id.* at 5 *citing* 1 Larson Employment Discrimination § 12.11; *EEOC v. Old Dominion Secur. Corp.*, *supra.* 1986 WL 32649.  The Court held that:

> Congress intended to prohibit this very kind of discrimination when it enacted the Pregnancy Discrimination Act.  The fact that Mr. Alford acted on his perception of the best interests of his employee is irrelevant. Mrs. Faillers alone is responsible for making decisions that affect her safety and that of her child.  *Id.* at *8.

Defendant's safety arguments are predicated on the unsupported and inadmissible medical assumptions set forth in its position statement (PX1 Whitfield Ex. 2).  Defendant thereafter attempts to distance itself from its medical basis and argues that the claimants were

fired at the request of the FBI. (PX2 Caroll p. 82, l. 16-20 &  PX2 Carroll Ex. 3); ( PX1

Whitfield Ex. 2  and PX2 Carroll Ex. 3 are the same document).  Niether argument supports a

BFOQ defense.

    2.    <u>Defendant May Not Establish A BFOQ Defense Or Otherwise Escape Liability</u>
<u>By Demonstrating That The FBI Ordered It To Fire Classmembers.</u>

To the extent that Defendant attempts to avoid liability for its discriminatory acts by

pointing to the FBI, the Court should not countenance such a tactic. To begin with, it is

implausible that the FBI, a law enforcement agency, would order Defendant to break the law.

The FBI confirms that it did not order Defendant to fire the women.  (PX6 Payne Dec. at ¶8;

PX5 M. Moore Dec. at ¶9).  Bernard Fisher was Defendant's liaison to the FBI. (PX3 Moore p.

38, l. 9 to p. 39, l. 2).  Fisher testified that the FBI never told him that pregnant women should be

removed from the ARC.  (PX10 Fisher p. 47, l. 8-10).  Defendant's argument that the FBI

ordered the terminations is inconsistent with other representations it has made in this matter.  If

the FBI truly did order Defendant to terminate the claimants there would have been no need for

Defendant, as it argued in its position statement, to have contacted a lawyer, attempted to

develop a medical basis for its decision and consulted its insurance agent in conjunction with

terminating Tolliver.  (PX1 Whitfield p. 57, l. 17 to p. 58, l. 16 & PX1 Whitfield Ex. 2).  If the

factual context makes the nonmoving party's claim implausible, that party must come forward

with more persuasive evidence than would otherwise be necessary to show that there is a genuine

issue for trial.  *Matsushita Elec. Indus. v. Zenith Radio Corp.* 475 U.S. 574, 588 (1986);

*California Arch'l Building Products, Inc. v. Franciscan Ceramics, Inc.,* 818 F.2d 1466, 1468 (9th

Cir. 1987).  Accordingly, Defendant may not create an issue of fact simply by presenting the self

serving testimony of some of its officers that the FBI ordered the firings.

Even if a factual issue did exist regarding the FBI's involvement in the terminations, it would not be a *material* issue of fact that could preclude summary judgment. A temp agency, like a law firm, or any other service based business, cannot violate the law at a customer's request. "To allow businesses to follow such customer preferences would only serve to entrench the sexual stereotypes Congress sought to address in passing Title VII." *Morris v. Bianchi,* 86 CV 0742-A, 1987 WL 11822, 43 Fair Empl. Prac. Cas. (BNA) 674**,** *19 (E.D. Va. Feb. 23, 1987) (holding that being male and "macho" were not bona fide occupational qualifications for administering a health club.), *citing*, *Diaz v. Pan American World Airways, Inc*., 442 F.2d 385, 389 (5th Cir. 1971), *cert. denied*, 404 U.S. 950 (1971).

A BFOQ defense cannot be premised on "the refusal to employ an individual based on the preferences of co-workers, the employer, clients or customers." *Diaz v. Pan American World Airways, Inc*., 442 F.2d at 389, (5th Cir. 1971), cert. denied, 404 U.S. 950 (1971) *citing* 29 CFR §1604.1(iii). "[C]ustomer preference may be taken into account only when it is based on the company's inability to perform the primary function or service it offers." *Id*. Here Defendant offered the service of providing staff to prepare 20 million documents for shipment to southwest Virginia. (PX2 Caroll p. 45, l. 18 to p. 46, l. 1 & PX1 Whitfield p. 32, l. 18 to p. 33, l. 5). There is no medical evidence to demonstrate that Proctor and Tolliver would have ever been unable to perform their duties and thereby impact Defendant's ability to meet its customer's needs. Tolliver was never given a chance to attempt the job and Proctor was performing well.

There is also no evidence that Tisdale's pregnancy would hinder Defendant's ability to meet the FBI's needs. She was restricted to lifting more than 15 pounds and prohibited from climbing ladders, but she worked in an environment where employees were permitted to ask for help carrying heavy packages up the ladders. (PX10 Fisher p. 40, l. 20 to p. 41, l. 18). The FBI,

Defendant's customer, would have supported moving Tisdale to the "disposition team" which performed filing from a seated position. (PX6 Payne Dec. at ¶¶14-15). The FBI also would have supported an arrangement in which another employee would perform lifting and ladder climbing tasks for a pregnant employee. (*Id.* ¶16). Accordingly, Tisdale was supporting Defendant's mission and there was no customer preference against her working with restrictions.

Even when an employer adopts federal military regulations, a BFOQ defense does not arise. In *Johnson v. State of N.Y.*, 49 F.3d 75, 78 (2d Cir. 1995), for instance, the court found that the State of New York violated that ADEA by adopting the Air National Guard's retirement policy and terminating an employee when he turned 60. The court specifically held that the State of New York could not adopt a facially discriminatory policy, "regardless of whether third parties are also involved in the discrimination." *Id.* at 79 *quoting Arizona Governing Committee for Tax Deferred Annuity and Deferred Compensation Plans v. Norris*, 463 U.S. 1073 (1983). Because, as is the case here, there was no dispute as to the basis for the plaintiff's termination, the court granted summary judgment in the plaintiff's favor. *Id.* at 80.

Defendant cannot avoid summary judgment simply by pointing its finger at the FBI. The facts are clear that, whatever the motivation, Defendant fired Proctor, Tolliver and Tisdale because they were pregnant. The record does not contain any facts that would provide a defense to this blatant discrimination and summary judgment in the Commission's favor is therefore appropriate.

**E.    Defendant Cannot Prove that Mitigation of Damages Was Less Than Adequate**

Defendant has raised the affirmative defense of Failure to Mitigate Damages. (EFC No. 5 Answer at ¶18). Summary Judgment in Plaintiff's favor on this affirmative defense is warranted. Failure to mitigate is an affirmative defense, and Defendant bears the burden of proving that

Charging Party and the classmember's efforts at mitigation were less than adequate. *Miller v. AT&T Corp.*, 250 F.3d 820, 838 (4th Cir. 2001); *Brady v. Thurston Motor Lines, Inc.*, 753 F.2d 1269, 1274 (4th Cir. 1985). Defendant bears the burden of establishing that the claimants' economic loses were avoidable because (1) claimants were qualified for existing, suitable positions that they could have discovered and that (2) they failed to use reasonable care in seeking such existing positions. *Edwards v. School Bd. ,* 658 F.2d 951, 596-597 (4th Cir. 1981); *Clark v. Frank*, 960 F.2d 1146, 1152 (2d Cir. 1992); *Wehr v. Burroughs Corp.*, 619 F.2d 276, 278 n.3 (3d Cir. 1980); *Gaddy v. Abex Corp.*, 884 F.2d 312, 318 (7th Cir. 1989); *Sias v. City Demonstration Agency*, 588 F.2d 692, 696 (9th Cir. 1978). The employer must also prove the amount of income that might have been earned had the claimant's efforts been diligent. *Chace v. Champion Spark Plug,* 732 F.Supp. 605, 610 (D.Md. 1990).

The claimant's duty to mitigate is not onerous, and does not require her to be successful in mitigation. *Rasimas v. Michigan Dep't of Mental Health,* 714 F.2d 614, 624 (6th Cir.1983). The record evidence demonstrates that Tolliver, Proctor and Tisdale-Ortiz took adequate, and in Tolliver's case extreme, measures to lessen their damages. Courts have held that activities such as sending out resumes, filing applications, reviewing classified advertisements, and discussing employment opportunities with friends fulfill the diligence requirement. *Younis v. Farooqi,* 597 F.Supp.2d 552, 556 (D. Md. 2009) (mitigation in immigration support case); *Dailey v. Societe Generale*, 108 F.3d 451, 456 (2d Cir. 1997); *Odima v. Westin Tucson Hotel*, 53 F.3d 1484, 1497 (9th Cir. 1995); *Hanna v. American Motors Corp.*, 724 F.2d 1300, 1309 (7th Cir. 1984). These activities, coupled with accepting work when available, are precisely the activities engaged in by claimants.

Within two weeks of her discharge Tolliver found work as a translator at Guantanamo Bay. (PX4 Tolliver Dec. ¶¶18-19). The translation work paid less than the job at the ARC but Tolliver's family could not afford to have her without paid work. (*Id.* at ¶17). Tolliver wanted to work at a job that would allow daily contact with her infant but she was unable to find other work. (*Id.* ¶22). The money that Tolliver has earned as a translator offsets any award of back pay made against Defendant. Accordingly, she has gone to great lengths to lessen any damages that Defendant may owe. In addition to her translation work, she has constantly pursued opportunities for other full time work. She has networked heavily, posted resumes online, applied for numerous positions and attended job fairs. (*Id.* at ¶23). To date, she has been unable to find work. (*Id.* at ¶24). Tolliver has mitigated her damages as a matter of law.

Proctor was out of work for a relatively short period of time. During this time she searched for other work by posting resumes on CareerBuilder.com and Monster.com. (PX8 Proctor Dec. ¶12). In October of 2009 her efforts paid off and she found work with another staffing agency that paid more than the ARC project. (*Id.* ¶13). She therefore seeks no back pay beyond October of 2009. While she was unemployed she took a few one day assignments from Defendant. (*Id.* ¶10). These positions paid less than the ARC project but she took them because no better paying job was available. (*Id.* ¶11). There is no record evidence indicating that Proctor's attempts at mitigation were less than adequate.

Tisdale has applied for over 100 positions since being terminated from the ARC project. (PX7 Tisdale Dec. ¶20 & Exhibit A to PX7 Tisdale Dec.). She also attempted to find work by networking and posting a resume on job search websites. (*Id.* ¶21). To improve her chances of finding employment, Tisdale enrolled in information technology courses through an online university. (*Id.* ¶22). The course work was done in addition to, and not instead of, an active job

search.  (*Id.*).  Tisdale remained unemployed past the date that the ARC project was discontinued.

Tisdale also accepted  work with Defendant including a full time assignment that paid less than

the ARC project.  (*Id.* at ¶¶16-17).  The amounts she earned at those positions are credited

against any back pay owed by the Defendant.  Her efforts at mitigation were therefore more than

adequate.

During EEOC's investigation of this matter Defendant argued that Tolliver failed to

accept available employment that it would have offered her had she attended a meeting.[13]  (PX1

Whitfield Ex. 2 p. 3).  On several occasions Tisdale turned down one day assignments from

Defendant due to an inability to find child care.[14]  (PX7 Tisdale ¶15).  Under no circumstances

could it be held that claimants failed to mitigate their damages by turning down single day

assignments with Defendant. [15]   An employer's offer of alternative employment will not cut-off

back pay when the claimant's position remains available. *Ford Motor v. EEOC*, 458 U.S. 219,

231 (1982) at n. 16, citations omitted.(Offer of reinstatement ineffective when discharged

employee offered a different job, though former position still existed.)  Here the ARC project

continued until September of 2010.  There is simply no record evidence that would enable

Defendant to meet its burden of proving that Tolliver, Tisdale or Proctor failed to mitigate.

---

[13] In fact, Defendant was not planning to offer Tolliver a job at the meeting.  (PX1 Whitfield p. 66, l. 6 to p. 67, l. 19).

[14]   The jobs she declined were only short term assignments.  (PX7 Tisdale ¶13-15).

[15]CTI did not have other jobs available for Charging Party and the classmembers at the time they were terminated. (PX3 Moore p. 90, l. 15-21 & PX2 Caroll p. 64, l. 6-20).

## IV. <u>CONCLUSION</u>

Defendant cannot, without further contradiction, argue that Tisdale, Tolliver and Proctor were fired for any reason other than pregnancy.  Nor can it justify the terminations in a manner that would constitute a BFOQ defense.  It also cannot marshal evidence to prove that Tisdale, Tolliver, and Proctor failed to mitigate their damages.  For these reasons, the Commission respectfully requests that this Court enter judgment against Defendant on the issues of liability and mitigation of damages and allow this mater to proceed to trial on the remaining issues.

Respectfully submitted,

/S
_____
DEBRA M. LAWRENCE
Regional Attorney

/S
_____
MARIA SALACUSE
Supervisory Trial Attorney
Federal Bar No. 15562

/S
_____
ERIC S. THOMPSON
Trial Attorney

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
10 S. Howard Street, 3rd Floor
Baltimore, Maryland  21201
(410) 209-2322 (phone)
(410) 962-4270 (fax)